### BUDER v. NEW YORK TRUST CO.

No. 259.

Circuit Court of Appeals, Second Circuit.

March 2, 1936.

White & Case, of New York City (David Paine and Orison S. Marden, both of New York City, of counsel), for appellant.

Edwards, Breckinridge & Noble, of New York City (W. H. L. Edwards, Richard S. Holmes, and J. Walter Edwards, all of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

In its main aspects this litigation is an action for damages for the alleged conversion of shares of corporate stock pledged with the defendant as collateral for a loan made to the plaintiff. The stock was disposed of under an option, given by the pledgee to a stockbrokerage firm under circumstances which the pledgee contends made this the fairest and best method of selling. But the defendant was not permitted to prove that disposal of the shares by means of an option was the customary and necessary way of obtaining the best price; and the issue of conversion was submitted to the jury under a charge which instructed them (1) that the giving of an option was unauthorized by the terms of the pledge, and if the defendant, without authority, placed the stock beyond his control, he then committed a conversion regardless of the date when the option was exercised, and (2) that the conduct of the defendant might be found to constitute a waiver of the power expressed in the collateral note to sell without notice. Two additional counts in the complaint charged the receipt of money to the plaintiff's use, and upon them a verdict was directed for the plaintiff. Recovery upon these counts, the defendant insists, is inconsistent with recovery for conversion.

The plaintiff is a lawyer residing in St. Louis, Mo., and jurisdiction rests on diversity of citizenship. On June 1, 1931, the plaintiff borrowed $250,000 from the defendant on his six months note, secured in the main by 20,000 shares of stock of Burroughs Adding Machine Company. When the note matured the loan was renewed in the sum of $190,000, and was evidenced by a demand note with the same collateral. The plaintiff had agreed to keep his collateral at least 30 per cent. above the amount of his loan. On April 1, 1932, he was notified that it had fallen below this margin and a substantial payment in reduction of his loan (then $175,000) was demanded. This demand not having been complied with, the defendant gave a firm of stockbrokers a thirty-day option on the Burroughs shares. This option, however, was never exercised and is not the option relied on as a conversion. The plaintiff was informed on May 3d that an option had been given, and made no protest. During the month of May correspondence and negotiations between the parties continued, but nothing came of them. By letter of June 3, 1932, the plaintiff was notified that his note was called and unless payment was made by June 7th the collateral would be disposed of "at public or private sale (by option or otherwise)." By the terms of the note the trust company was authorized to sell all or any of the collateral at public or private sale, for cash, upon credit or for future delivery, without advertisement or notice. Payment not being made, on June 7th the defendant gave a second option but this also expired with-

out the stock being taken. The third thirty-day option to the same brokers was given on July 8th at a price of $8.25 net per share. It provided for loaning the shares to the brokers without premium. On July 8th the market price for Burroughs stock was only 6⅝, but during the entire month of August market quotations were above the option price. Between August 1st and 8th the stock was sold under the option. By letter of July 11th, the plaintiff was notified that the option had been given but no details were mentioned. On July 27th he wrote the defendant offering additional security and asking to have his note extended. The trust company replied on the 28th that it could not accede to his request because the stock was under option, as he had previously been informed, and was beyond its control until August 8th. The plaintiff testified that before this letter was received he had incurred expense in reliance upon the promise of Attorney Mitchell, representing the defendant, that his note would be extended. More will be said of this in discussing the contention that the right to sell without notice was waived by the defendant.

The sale of the pledged collateral realized enough to pay the note in full and leave a surplus of $6,439.12, which the defendant sent to the plaintiff with a statement of the account. He declined to accept it, however, and somewhat later notified the defendant that he disputed its right to have made the sale. Thereafter he brought this action. His complaint set out four causes of action. The first was withdrawn and need not be further mentioned; the second was for conversion; the third claimed the above mentioned surplus of $6,439.12; and the fourth related to a dividend on Burroughs stock payable September 6, 1932. The stock sold ex-dividend on August 6th, and the dividend of $3,800 on 19,000 shares taken up by the option holder subsequent to that date, was received by the defendant and tendered by it to the plaintiff. He declined it, claiming to be entitled to $4,000, the dividend on the full 20,000 shares. On all three counts the plaintiff had a verdict, the damages awarded for conversion being $34,400 above his liability on his note.

The plaintiff contends that a power of sale does not include a power to give an option on the property to be sold. He relies on authorities relating to powers of agents, trustees, and executors to sell land.

Ives v. Davenport, 3 Hill (N.Y.) 373; Matter of Armory Board, 29 Misc. 174, 60 N.Y.S. 882; Hickok v. Still, 168 Pa. 155, 31 A. 1100, 47 Am.St.Rep. 880; Moore v. Trainer, 252 Pa. 367, 97 A. 462; Tibbs v. Zirkle, 55 W.Va. 49, 46 S.E. 701, 104 Am. St.Rep. 977, 2 Ann.Cas. 421. Trogden v. Williams, 144 N.C. 192, 56 S.E. 865, 10 L. R.A.(N.S.) 867; Cozad v. Johnson, 171 N. C. 637, 89 S.E. 37. The reason usually given is that the granting of an option is not itself a sale and precludes any exercise of the power of sale while the option lasts; thus the grantor deprives himself of the discretion he is bound to exercise for the benefit of the donor of the power. This is good ground for the decisions cited and is true enough as between pledgee and pledgor under ordinary circumstances. But we cannot think the rule is of invariable and universal application. The power of sale must be interpreted with an eye to its purpose and ought to carry such incidental powers as make for the advantage of both parties. Thus the pledgee may resort to other lawful means of realizing on the collateral even though the contract of pledge expressly authorizes only a sale. Warburton v. Trust Co., 182 F. 769, 775 (C.C.A. 3); Coffin v. Chicago N. P. Const. Co., 67 Barb. (N.Y.) 337. And even a trustee has been permitted to give an option where that was the customary and most appropriate method of realizing the best price. Loud v. St. Louis Union Trust Co., 313 Mo. 552, 281 S.W. 744. If the pledge consists of stock which is daily sold in large quantities on the Exchange, a power to give an option on such shares should not be implied, for there is no reason to suppose that they could not be sold to the best advantage at the market. However broad his power of sale, a pledgee may not wantonly sacrifice the property, and he would doubtless have difficulty in justifying a sale of such shares in any other way than on the Exchange. Compare Hiscock v. Varick Bank, 206 U.S. 28, 38, 27 S.Ct. 681, 51 L. Ed. 945; Warner v. Powelson, 240 F. 628, 630 (C.C.A.2). But the defendant offered to prove that the Burroughs shares did not have a broad and active market in the summer of 1932, and to supplement the proof with testimony that the giving of an option was the necessary and customary way to dispose to the best advantage of so large a quantity of stock of this character, because it enabled a market to be prepared in advance and avoided the sacrifice of prices which would follow from throwing

20,000 shares on the market at once. It is true that the pledgor was not required to sell all at once; he could peddle it out in small quantities over a longer period, but it by no means follows that he must do so rather than give an option to a broker who will work up the market for the benefit of all concerned. All such evidence was excluded. This was error, for if the defendant could prove that the giving of the option was the reasonable and customary way to realize upon so large a block of Burroughs stock, the power to give it should be construed as incidentally embraced within the power to sell "at public or private sale, for cash upon credit or for future delivery." Such conclusion is supported by the decision in Loud v. St. Louis Trust Co., 313 Mo. 552, 281 S.W. 744; dicta that an option given for a short period according to customary methods and with a view to promoting an advantageous sale "would not necessarily be disapproved" may be found in Cozad v. Johnson, 171 N.C. 637, 643, 89 S.E. 37, 40. See, also, In re Cardon's Estate, 278 Pa. 153, 122 A. 234, 235.

■ Moreover, there was evidence that the parties themselves construed the collateral note as authorizing a sale by means of a short option. The first option was given on April 9th. The plaintiff admits he was told of it, though he denied he knew its terms. On May 3d the defendant wrote the plaintiff, saying that he would "remember" that the option terminates on May 7th. By the letter of June 3d he was told that, if his note was not paid by June 7th, the trust company would sell the collateral "by option or otherwise." The letter of July 11th informed him of the option of June 7th and that it was being extended for a further period. At no time did he protest against this method of disposing of the pledged stock; nor did he do so when the more explicit letter of July 28th informed him that the third option would not expire until August 8th. The defendant's repeated selection of this method of sale without protest by the plaintiff is persuasive evidence of their mutual understanding that such a method was within the terms of their contract. When a written contract is clear and unambiguous, the conduct of the parties cannot be used to prove that it means something different than it says; but when there is ambiguity in its meaning, the construction which the parties have themselves placed upon it is of great significance. Brooklyn Life Insurance Co. v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410; Topliff v. Topliff, 122 U.S. 121, 131, 7 S. Ct. 1057, 30 L.Ed. 1110; Vital v. Kerr, 297 F. 959, 968 (C.C.A.2); Weagant v. Bowers, 57 F.(2d) 679, 682 (C.C.A.2). As already indicated, we cannot say by looking only to the terms of the pledge whether they were meant to exclude or include a sale by option of the Burroughs stock. Hence it is permissible to see how the parties construed them. The evidence on that subject has been rehearsed. It is not to be viewed as bearing on a question of ratification by the pledgor of unauthorized conduct by the pledgee but on the question of prior authorization. Therefore it is unimportant whether the plaintiff knew the precise terms of the options; it was the method of disposal as to which his silence showed agreement with the pledgee's construction of the powers conferred by the collateral note. It was error to charge that the giving of the option was unauthorized.

■ Despite his contention that the giving of the option of July 8th was unauthorized, the plaintiff took the position at the trial, as he does here, that the alleged conversion did not occur on that date but on July 28th. Apparently the argument is that the option was revocable because the stock brokerage firm paid no money for it, and therefore it was only the pledgee's letter of July 28th recognizing it as binding that constituted an unauthorized exercise of dominion over the pledgor's property. If the option was not binding, it was no more than an offer to sell; an offer which did not limit the pledgee's discretion as to price since he was legally privileged to withdraw it before acceptance. The making of a revocable offer cannot be a conversion, nor can the sale effected by its acceptance. If the property was sold at an inadequate price, the pledgee might be called to account, but not for a conversion. Neither can the letter of July 28th be deemed a conversion. It changed no legal relations; it denied no right of the pledgor. If the option was revocable, it still remained so. The letter must be read as expressing either an intention not to withdraw a revocable offer to sell or an opinion that the offer was not legally revocable. Neither meaning can make it an exercise of dominion over the pledgor's property. Moreover, the identical "recognition" of the option was expressed to the plaintiff in the letter of July 11th and to the option holder in the very

act of giving it. Under no possible theory of conversion could the date of July 28th be material, and the charge, in so far as it stated the contrary, was wrong.

■ The plaintiff's next contention is that the trust company waived its privilege of selling without notice. This theory is based upon the case of Toplitz v. Bauer, 161 N.Y. 325, 55 N.E. 1059, which holds that a pledgee may, without formal contract, give by conduct such assurance to the debtor that further time and indulgence will be granted as will amount to a waiver of the right to sell the collateral without prior demand or notice. In the case at bar the question of waiver was submitted to the jury. We are satisfied that there was no evidence to justify the submission of such an issue. The claim of waiver is based solely on an alleged conversation with Mr. S. A. Mitchell on July 27th. On that day the plaintiff had written to the defendant's vice president in New York to the effect that he was able to procure $50,-000 of term insurance, the application for which must be made before July 30th, and asking for an extension of his note provided he took out such insurance and assigned it to the defendant. He testified that after this letter was sent he telephoned Attorney Mitchell and was told that if he got the insurance and assigned a legal fee due him, the attorney would see that he got an extension. Mitchell denies the conversation and his denial should be more persuasive than the plaintiff's assertion, which came as an afterthought (following a recess) to his previous recital of what the conversation was. But assuming that the jury might believe the plaintiff's story, there was no evidence whatever that Mitchell had any authority to make such a promise on behalf of the defendant, nor that the defendant had held him out as having such authority. On May 18th when the plaintiff requested an extension based on an assignment of insurance and the Franz fee, the defendant's vice president had declared expressly: "There will be no extension. The demand note will remain as it is." It was on this occasion that the plaintiff was told that any further negotiations would have to be taken up through attorney Mitchell. Nothing was said to suggest that he would have authority to override the vice president's declaration that the note was not to be extended, or that he was to have authority to do any more than negotiate for the acceptance of the insurance and fee as additional security by which more adequately to margin the note. This was before the plaintiff's note had been called. After payment in full was demanded by the letter of June 3d, there was even less reason to suppose that Mitchell had authority to extend the note. And obviously the plaintiff did not believe that Mitchell had such authority, for his subsequent requests for indulgence were made by letters of June 6th and July 27th addressed to the vice president in New York.

From the foregoing discussion we think it is apparent that the cause of action based on a charge of conversion should not have been submitted to the jury. Assuming the option to have been binding when given, or to have become binding by reason of the expenditure by the stockbrokers of effort or money in reliance upon it, the sale of the stock by this method was within the authority of the pledge as construed by the parties. Assuming the option to have remained legally revocable, neither the defendant's "recognition" of it by the letter of July 28th, nor the sale of the stock pursuant to such revocable offer, could be a conversion. Finally, there was no evidence that any one with actual or apparent authority to act for the defendant had given the plaintiff an assurance that the note would be extended; hence the plaintiff failed to sustain the contention that the shares were converted by sale after a waiver of the right to sell without notice. The defendant's motion to dismiss the cause of action for conversion should have been granted.

■ The third cause of action, for the $6,-439.12 surplus, is clearly alternative to the cause of action for conversion. It is on the theory that the trust company owes the amount of money actually realized on the sale. If it is charged with the conversion value of the shares it cannot also be charged with what it realized from a sale of the converted property. Such a sale is for itself alone, as much as if it purchased the shares by paying their conversion value. It was utterly inconsistent to permit a recovery on both the second and third counts. It is likewise as to the fourth count. If the conversion value of the shares was awarded as of a date prior to August 6, when the shares sold ex-dividend, the dividend would belong to the defendant. It cannot be required to pay for

the shares and also to account for what they may produce thereafter.

But these questions of inconsistent remedies will probably not arise on the new trial to be conducted in conformity with this opinion, since on the same proof the action for conversion should not be submitted to the jury.

Judgment reversed and cause remanded.