### CHICAGO & W. I. R. CO. v. CHICAGO & E. R. CO.

### CHICAGO & E. R. CO. v. CHICAGO & W. I. R. CO.
### No. 7878.

Circuit Court of Appeals, Seventh Circuit.
March 19, 1943.

Clyde E. Shorey, Robert W. Schupp, and Frederic Barth, all of Chicago, Ill., for Chicago & Erie R. Co.

J. R. Barse, Ernest S. Ballard, and Francis H. Uriell, all of Chicago, Ill., for Chicago & Western Indiana R. Co.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

This is a companion appeal to Nos. 7875-7, disposed of March 17, 1943, 140 F.2d 120. The facts set forth in that opin-ion and the statement of this court in its opinion in In re Chicago & E. I. R. Co., 94 F.2d 296, furnish additional background for the issues here presented. The parties will be named as in the companion cases.

Here, as there, the controversy arises out of agreements made by the Western Indiana and its five co-owner lessees and deals with so-called management costs and working expenses of this terminal railroad.

Western Indiana brought suit against Erie to recover what it asserted was an un-paid portion of Erie's share of management costs. Erie answered and counterclaimed, setting forth that it had paid more than it should have paid, and demanded judgment for the overpayments. It also asked that it be not required to participate in the operation of the suburban service of West-ern Indiana, which has been and is con-ducted at a loss. Judgment was rendered against Erie in favor of Western Indiana for the sum of $114,071.13 on the manage-ment, and for $42,467.87 on the disputed rental issues.

Erie seeks to reverse this judgment and to recover $125,229.67 for overpayment of management or general overhead cost. While some of the questions determined in appeals Nos. 7875, 6, 7 are considered by counsel in their briefs on this appeal, we will refrain from considering or again stating the facts which furnished the back-ground for the disposition of those appeals.

Two separate and distinct questions are presented by Erie. One involves the relief by it sought in respect to the operation of the losing suburban business by Western Indiana. The other question is the method of distributing the entire cost of "manage-ment operation, maintenance, repair, and renewal of, and taxes, liens, water rents, and assessments on Western Indiana Rail-road buildings and facilities." The second question covers not only the money judg-ment entered in favor of Western Indiana against Erie, but the sum demanded by Erie on its counterclaim.

Erie contends that rentals based on a user basis can not be determined by the wheel-age basis alone. The user basis, supple-mented by the division of the railroad prop-erty into sections, requires not only the determination of the amount of use as measured by cars and engines, but calls for consideration of the character of the use by sections. In other words, Erie asserts that the sharp variations in costs and

proportions of user services in the different sections, necessitate attention to sections as such.

The cost of operation varies when measured by engine or car miles, due principally: (a) to services for passenger station and coach switching exclusively for passenger traffic; (b) to other special services for both passenger and freight traffic at the north end of the common property; (c) to a smaller volume of traffic on some portions than on others.

Erie illustrates the unjust distributions of a uniform rate, a rate which ignores section lines, by taking a single mile in one section and comparing it with a mile operated in another section. It asserts that Western Indiana charged at a rate of 1.63¢ a mile for miles run in Dearborn station "A" while the cost of materials and labor amounts to $1.90, whereas the material and labor cost was less than 3¢, south of 55th Street.

More specifically it may be said that Erie predicates its argument on the July 1st, 1902 agreement, which is one agreement where the 1882 inter-tenant agreement is specifically changed.

Paragraph 33 specifically provides (contrary to the 1882 agreement) for the creation of sections as units of use by different railroads. The particular clause here involved reads as follows:

"* * * and the entire cost of the management, * * * shall be borne by said lessees in the proportion of their several wheelage uses of the various portions of said railroad to the total wheelage use thereof;

"and for the purpose of distributing such cost, the lessor shall divide by lines across and at right angles with its right of way, its said railroad and property, including all appurtenances, into such sections as may be necessary in order *to equitably distribute such cost of management*, operation, maintenance, repair and renewal of, and all taxes, liens, water rents and assessments on, said *several sections* among the parties of the second part in proportion to their respective wheelage uses of such sections;

"And it may, from time to time, change such sectional divisions the better to subserve the purpose and intent aforesaid." (Italics ours.)

A chart showing how plaintiff's property is divided into sections is a part of the record. It is not denied (as Erie contends) that certain sections do not require the same amount of management expense as other sections. It is not questioned, but that the heavy management expense is either at Dearborn Station "A" or Dearborn Station "B." One section includes Dearborn Station "A" and the railroad tracks for about half a mile south of it. The railroad tracks require but a small part of the cost for the station services as a whole. The charges for such cost of material and labor for this station are placed against the users and based on the number of engines and cars leaving the station. The user's apportionment of its general overhead costs is based on the total engine and car miles run on the common property. Approximately 99% of such miles were outside of the station section and consisted chiefly of miles run of freight traffic, which did not use the passenger station or call for the extra services incident to passenger business. It cites a single month where the actual cost charged was computed and found to be $172 for management, whereas the expense (labor and material) was a hundred times that amount. It could hardly be otherwise.

But the vital question is,—Did the parties by their agreement provide for a division on a section basis, so as to adjust—in part at least—what is apparently an injustice (due to changes in amount and character of business done by the lessees) if user's service is determined by wheelage on all the common property? If the parties have *not so* agreed, *the courts can give the aggrieved lessees no redress.* On the other hand, if the agreement permits of more equitable adjustment of this item among lessees, based on section consideration, we are not inclined to give much heed to action forced on Western Indiana by one tenant who is relying on an unfortunate by-law which requires unanimous vote to make a change in the agreement.

Basically the question is whether Western Indiana, in apportioning management costs on a *user basis*, has made, and is making, a proper apportionment of such costs, in view of the contracts which govern the subject.

Erie asserts that plaintiff does not make any charge against the units of service for managing its production, nor does it require its users to pay a share of the general overhead cost of service based on management work done in producing it.

It apportions such cost at a uniform rate per mile of movement of engines and cars by its lessees for all of the common property, and for that purpose it keeps an account of engine and car miles run by its lessees on the common property. All items of cost other than such as are assigned to some one section and property taxes, are designated as "management" cost and charged to the users of the common property in the proportions which their engine and car miles bear to the total engine and car miles. The freight traffic, for which practically no special services are furnished, is charged the same rate per mile as the passenger traffic which receives terminal station and other special services. In other words, the charge is that in apportioning the general overhead cost the sections are disregarded and serve no purpose and the variation in cost from section to section is not considered.

Without elaborating the details showing the injustices that follow the practice of ignoring the sections and the character of the service rendered therein, it is, we think, sufficient for our conclusion to determine the purpose of the provision in the agreement which specifically dealt with *sections, as such,* and construe and apply such above-quoted provision.

We fail to understand why this agreement, which changed the existing agreement, was inserted, unless the parties contemplated, and intended, adjustment of management expense on the basis of kind of use which took place in the different sections. The difference between that section which contained the depot and the sections which marked the boundaries of a part of the freight yard, is so obvious that it is hardly conceivable that the lessees should ever have agreed to a division of said cost on any basis which did not take into consideration the kind of service demanded and rendered, as well as the extent of such use. For the kind of use determined the kind of service Western Indiana rendered, and it in turn measured the cost of such service.

The agreement expressly provided that it was *"for the purpose of distributing such costs"* of management operation, maintenance, etc., that the "lessor shall divide its railroad property *into sections"* by lines which ran across and at right angles with its right of way. Moreover, it expressly provided that Western Indiana might "from time to time, change such sectional divi-

sions *to better subserve the purpose and intent aforesaid."*

Clearly, this intention was *to more equitably distribute the management costs.*

If all lessees made like use of the common property, there would be no basis for complaint. But where variances existed in lessees' passenger and freight business, the adopted method could not be equitable and just.

In view of the results, we can see no reason for sustaining a practice which wholly ignored the agreement which provided for a division of the common property into sections. We can see no reason for dividing the property into sections, save as a practical matter, the kinds of services varied, the costs thereof varied, and the parties wanted to apportion the costs as fairly as possible, and the sectional basis promoted equitable distribution of costs.

The only reason that seemingly is advanced in opposition to Erie's contention is that the practice has been long continued. This objection, we rejected in the capital stock tax case. In other words, recovery was not barred by voluntary payment in such a case. In the companion cases we reached the same conclusion. We reaffirm it here.

It follows that apportionment of management costs as now and heretofore made, can not be sustained.

The money judgment against the Erie, in favor of Western Indiana, must be, and is, reversed. However, it does not follow that judgment should be directed in favor of Erie for the amount it claims to have overpaid, towit, $125,229.67. Inasmuch as the District Court decided it was not entitled to recover at all, the court did not pass upon the items which make up this amount. Likewise, there may be issues not presented to us, such as estoppel, laches, or the statute of limitations, which have not been passed on by the District Court, and which may have a bearing on the right of Erie, or the amount which Erie may recover for overpayment of management or general overhead costs.

Respecting Erie's right to be relieved from the expense of the unprofitable operation of Western Indiana suburban business, we are not satisfied from the record before us as to the origin of this service. We do not know whether it was rendered as a part of the Western Indiana's

'duty as a common carrier or whether it was ordered either by the Illinois Commerce Commission or the Interstate Commerce Commission. Moreover, it may be that the service can not be discontinued,. without consent or approval of one of these bodies. On the showing before us, we are not prepared to grant the relief sought. Its denial will be without prejudice.

The judgment of the District Court is reversed, and the cause is remanded with instructions to dismiss the action of Western Indiana against Erie and to take such further evidence as may be necessary to determine whether the Erie shall recover on its counterclaim, and, if anything, the amount thereof.